Here to meet you, here to you, this Honorable Appellate Court for the 2nd Judicial District is now back in session. The Honorable Christopher M. Kennedy is up. Good morning, everyone. Please be seated. Your Honor, the case we're looking at this morning is 2-25-0097. Logan Bland v. Appellate v. Q-West, Inc. Defendant. Arguing on behalf of the defense, Mr. David M. Maxey. Arguing on behalf of the appellate, Mr. Michael W. Brassett. All right, Mr. Maxey, you may proceed when ready. Please feel free to adjust the microphone. Thank you, Your Honor. Your Honor, David Maxey on behalf of Defendant Q-West. May it please the Court. Counsel. I'm here today on behalf of Defendant Q-West to argue for reversal and for a remand for a new trial. It's unfortunate because we were before this Court a few years ago at the end of a trial, and we asked for a new trial then, and the Court granted that new trial based upon trial errors, namely unfairness in the point of using the manual, the employee manual, for purposes of establishing a duty in the conduct of the defendant, for failing to, the trial court's failure to allow us to plead the affirmative defense of self-defense and then to instruct the jury for other evidentiary and jury instruction errors. Unfortunately, the second time around, the same errors cropped up. The major error that we believe warrants reversal is that the trial court denied us leave to name a biomechanical expert upon remand and to make, to settle us untimely. Unfortunately, we believe the Court got that wrong because if you look at the timeline of events in this case, on June 25, 2021, that was during the middle of the first trial, Dr. Szilagyi, who was the medical expert for the plaintiff, testified over objection while narrating the video of the events in the cue bar about this, what was happening when Mr. Bland was injured. And he testified with undisclosed reconstruction and biomechanical opinions. That was objected to. And then on June 29, a few days later, the plaintiff closed his case. And when he closed his case, he asked to amend his complaint to conform it to the pleadings. And in that amendment, he asked that he be allowed to pledge or be allowed to pledge and the jury to rule upon whether Mr. Bland was manhandled on the way that he was removed from the bar. All right, that's the first case. So the first appeal was reversed because of the self-defense. Correct. Pleading was not allowed. Yes. How is the biomechanical expert a self-defense expert? Oh, because to explain what happened in the vestibule, no one was allowed, in the second trial, no one was allowed to, the witnesses were not allowed to look at the testimony, the plaintiff's witnesses, the undefense witnesses, the experts were not allowed to look at the testimony of Whitmer or O'Hara about what happened in the vestibule. Our biomechanical expert was prepared to come in and testify as to what happened in the vestibule based upon the evidence of the witness testimony, the video testimony, and biomechanical reconstruction of what happened exactly from looking at the different aspects of what you could see from the video with the feet coming up and kicking at the two defendants and that one of the two employees and how they immediately pushed the feet away with hardly any force whatsoever. But didn't Whitmer testify to that, that he was kicked? Yes, that O'Hara was kicking the head, Whitmer was kicked at, he was kicking at Whitmer. So the two employees did testify that they were kicked. Yes, they did. Were they allowed to testify as to what their mindset was at the time they were being kicked or kicked at? Yes, they were. Okay, so then what is the expert going to add to that? He's going to add to that, that Dr. Salaghi said that Whitmer and O'Hara picked his legs up and threw him over on his head and crushed his neck. That was to rebut that testimony. That was to rebut that testimony. Was that new in the second trial? Well, it's new because the first time it came up in the first trial was at trial, Dr. Salaghi testified over objection during the trial, narrated that video, and said that these individuals picked the legs up and threw him over. That was not in his report. That was not in his report, it was not in his disclosures, and it was not in his deposition. They were totally entirely new opinions. Now, the judge said that they were encompassed with what he had said in this testimony. Because he referred to the video. Correct, correct. He said that Dr. Salaghi had reviewed the video. Yes, yes. So how is that not just a corollary to his testimony? Well, this doctor's a medical doctor. He doesn't have a background in biomechanics and reconstruction activity. He was reconstructing that. And that's proved if you look at the plaintiff, as they said in their post-trial motion. Plaintiff's counsel contended that Dr. Salaghi, okay, so in the closing, plaintiff's counsel said that Dr. Salaghi told you that vector and force, or speed, velocity caused this problem. He described how quickly it went forward, everything that tore the force applied, and the resulting offset. And he told you that this injury occurs only from considerable force applied on the head, and neck, and hyperflex position. Nobody has said anything else. Key, nobody has said anything else. We didn't have anyone to rebut that because we were partnering with an expert, and that's a biomechanical expert. This reminded me of just watching the video of a wrestling accident that I viewed when I was a young high school student, and a kid broke his neck from trying to get out of a hole. It went over backwards. Yeah, yeah. And that's what happened here, regardless of whether he was pushed or it was his own, he went over backwards on his neck, and that stress is what caused his broken neck. Right, but the reason why this is important is... If that's the mechanism of injury, why does the expert have to read that? Because either way, that's what happened. The plaintiff has an expert, Dr. Salaghi, very well-qualified doctor, not qualified in biomechanics. He's up there testifying this to the jury. We have no expert to counter that. We have two witnesses who were there, the two employees who are being blamed. We don't have an independent expert looking at this to decide and say, look, they didn't pick his legs up. They didn't throw him over and break his neck. They basically, as they testified, they pushed him, and it took one second, and Dr. Salaghi and Dr. Rundell is going to testify that just that little bit of force could cause somebody to flip over backwards when he was in that upward supine position with his legs up, and if somebody actually pushes your legs, it could cause you to accidentally fall back and break your neck. So it's a causation argument. Well, it's a reconstruction of what happened in causation together. So are you arguing that this falls under self-defense or not? Yes, self-defense. It supports the defense of self-defense. Plaintiff's expert says they picked him up and they threw his legs over and broke his neck. We're saying this expert said they just pushed his legs. It didn't take that much, only five pounds of force, just that much force. So let's assume that that is unassailably true. What does that have to do with the mindset of the defendant in feeling he was in apprehension of great bodily harm? I don't believe that's what we have him to testify to. We have him to testify that the activities of these individuals was solely, they said they were doing it in self-defense. They weren't doing it to try to throw him over. Is this being presented as what the mindset of the victim or the mindset of the bouncers or was it the mindset of, I shouldn't call it mindset, I should suggest the nature and extent of the force exerted to deflect the kick as opposed to the counterclaim, which was they picked him up and they manhandled him and in the process of manhandling him, he was injured. Correct, the third one. It's the nature of force of what happened and then it's to counter the idea that he was manhandled and thrown on his neck by these individuals. We had no testimony there, no reconstruction, no biomedical testimony to counter Dr. Slahey. And also, with respect to timing, the judge said, well, the plaintiffs are going to get a rebuttal expert. You're not going to get, excuse me, if we allow this, then you're going to have to have a rebuttal. The plaintiffs are going to have to have a rebuttal. Well, first of all, there was no objection for the defense that the plaintiffs want a rebuttal, but in reality, Dr. Rendell was coming in to rebut what Dr. Slahey said, which is that the vector of force, the speed of velocity caused this problem and all those, that kind of testimony and that he was thrown on his head and then broke his neck. That was what our expert was going to testify to. Dr., the trial court in ruling on this issue said the appellate court did not remand with any specific directions as to what evidence should be allowed or disallowed. You know, the parties have the right to choose what evidence they're going to present, right? Correct. Yes. But that was basically what the trial court said, and then he denied you the opportunity to call and have that evidence presented to the jury. Absolutely. It made no sense because, as you said, when a judgment is reversed, this is the law, and when the cause is remanded with directions to proceed in conformity with the decision then filed, and it appears from the opinion that the grounds of reversal are of a character to be obviated by dot, dot, dot, the introduction of additional evidence, the trial court is bound to permit the cause to be redocted and to permit dot, dot, dot, the introduction of further evidence on the new hearing. That's Clemens versus mechanical devices. And we believe that's, first of all, he had a duty to do that, the court had a duty to do that, but then putting that aside, even if it wasn't duty bound, even though we believe this would have obviated the issue of self-defense, which is the reason the case was originally reversed, was to allow the defendants to put on their self-defense and have this case fairly tried in front of a jury, with every party having the right to have their evidence that supported their cause. So that the other is that the court has discretion, if it's not clear. And then here we believe that the court did not properly exercise its discretion. It abused its discretion because, as I said, the prior trial, Dr. Salehi testified to us it was a surprise. It wasn't set forth that he was going to narrate to the jury the way this guy was injured, and then they were allowed leave to file their affirmative defense, I mean, then they were allowed leave to amend their complaint to an add-man handling, and then we were denied leave to file our affirmative defense. And then on remand, we immediately come in and asked to have an expert to counter Dr. Salehi. So that was the major issue that we believe. One more question on that matter. So you said the trial court had a duty to allow new evidence. Does that mean that the trial court was required to reopen discovery? We believe in this case, yes. And we believe in this case, yes, because this would have obviated the error of not allowing us to have the affirmative defense and then not allowing the jury to be instructed on the affirmative defense of self-defense. Of self-defense. All right, which, I mean, to me, still brings us back to what extent the biomechanics refers to self-defense, because the self-defense is force is threatened, the person threatened is not the aggressor, danger is imminent, force is unlawful. Is that what you're getting at, the force is unlawful? Force is unlawful, that these individuals were facing a direct threat, that it wasn't that they just threw his legs over just to break his neck. They were facing clear kicks to the head by this individual, and they reacted to that by pushing his legs away. And in that process, they did not, it was not, they didn't pick him up and throw him, which was what the jury said, excessive force, that's another of their alleging, excessive force, manhandling this guy, throwing him on the bar, and breaking his neck, as if that was the problem. They were dragging him out. That's clear from the videos. He was being dragged out, and there was a pull on his arm, and you can see that in the video.  I mean, he was, quote, unquote, manhandled. The question is whether or not that force that was used was reasonable under the circumstances, right? Correct, correct. Your argument is that they were not injuring him. He didn't have any injuries on his face. He didn't have any bruises on his chest or back. He had a broken neck. Correct. And our biomechanical expert, reconstruction expert, would have explained how that would have been possible without having him, as Dr. Szalegi testified to, picked up and thrown on his neck. What is your response to the plaintiff's argument that you knew well in advance of trial that biomechanical testimony would be offered by plaintiff's experts? Well, again, that's not true. I mean, the trial attorney in this case during the first trial was Dan Boho, and he took the guy's, or somebody from that office took the deposition of Dr. Szalegi. He never mentioned it. These are Rule 213F3 experts, and these are not backwitnesses that we have to try to pull things out of people. They're to tell us what their opinions are, what they're going to say. He didn't disclose anything about biomechanical or reconstruction type of testimony. He just basically just said what the injury was, and they blamed it on everybody else as well. It wasn't just the cue ball. There was a lot of other individuals involved at that time. He certainly didn't narrate the video. So it was a complete surprise, and that's why when Boho saw it, Mr. Boho saw it at the trial, he immediately objected to it. So this is unheard of. I can't believe the judge says, well, he said that he looked at the video. He's a 213F3. We're supposed to know what he's going to say, not be surprised at trial that now he's putting a video up and showing it. And the problem was, Judge, this happened on remand. So then on the second trial, we're barred from bringing our own expert, and then again we object to Dr. Szalegi who has no qualifications to be a biomechanical and off reconstruction testimony. We argue that. And then on the second trial, he gets up and starts testifying, again narrating the video only as I've read into the record what he was talking about. And that's why we believe we were duly prejudiced here. Well, you just said that he wasn't a biomedical expert. Was he ever – were you ever given notice that he was going to be a biomedical expert? No, I was never given notice of that either. So it wasn't until you found out that he was being proffered as a biomedical expert that you wished to have a biomedical expert of your own? Correct. And what did the trial court say to that? Too late? Too late. Really too late. We should have known this from the first. So am I to understand then that you're supposed to have precognitive powers and you're supposed to know the panoply of opinions that some expert is going to give that isn't in the record? I mean, that's apparently what the court thought. That's why I started this argument with the timeline, because it doesn't make sense. Can I say something?  No, you go ahead. The manual. Oh, that is – again, that's – But both sides – I mean, you were basically forced to ask questions of the manual.  I mean, it was littered all through here. We had your first decision from this court saying the manual does not provide duty that's improper argument based on the manual, improper use of the manual. Yeah, the second trial, as I've got in the brief, you'll see, it's like – We did not say the manual would be irrelevant. We didn't say that, did we? No, not that it's not irrelevant, but you don't highlight it and make it the centerpiece of your case. And say you prove duty right here. It's in the manual. Correct. They didn't actually use the word prove duty, but they basically would ask each witness, the manual tells you to do this. You're supposed to remove the person at this point. You're supposed to cut him off at this point. You're supposed to do this at this point. It went on and on. It was from Mr. Taft, the owner, then the manager, Tiffany Finlayson, another guy that worked there, Michael Finlayson, even Whitmer. They were saying this is what the manual provides, and then end the closing argument. That put Q West on notice that it did not remove Logan earlier. Something like this would happen.  Yeah, it is. It's a made-up comment. Yeah. Speaking about the manual. Yes, and we believe that – it was almost – this court's decision was almost rule of the case, you could say. And then to come back and do that, we filed a motion to stop it. It was unheeded. He allowed it, and the plaintiff continued to do it. It didn't make sense, but that's what happened. And we believe that was grossly unfair. And that in and of itself – The plaintiff argues that the case – the plaintiff's case was so strong that those errors did not affect the jury's verdict. Well, that's not true. Especially not true because we had the two witnesses there testifying to what they did. That's number one. And because we were barred from having a biomechanical reconstruction expert, that hindered us from bringing it forth. And then we allowed – the court allowed Dr. Szilagyi to give the same biomechanical opinions that he did in the first trial, which hindered us. And then we had our own security expert who was not allowed to look at the testimony of Whitmer and O'Hara, the two guys that were in the vestibule, so that he could testify consistent with what they had said. That he could look at it and say, you know, I read this testimony. You know, he wasn't allowed to read it. And then they asked questions about, did anybody say that they felt a fear or they were concerned about their safety based upon not having, you know – their fear of safety, well, the blame was kicking in their head and faces. So, yeah, the security expert would not have changed his opinion, right? He would have just used the fact that he had read the deposition just to bolster his original opinion.  Absolutely. And the plaintiff wouldn't have been allowed to cross-examine him and ask him, hey, is there any evidence in the record that these guys had any concerns about being kicked in the face or head? And we could have said, yes, there it is in their testimony. All right. Any further? No. All right, counsel, you will have time on rebuttal. All right, thank you so much. Mr. Rastak, you may begin when ready. Please feel free to adjust the microphone. Good morning, Your Honor. Excuse me. Good morning, Your Honor. This is Michael Rastak. I'm here on behalf of the plaintiff's faculty, Logan Bland. Obviously, the focus has been on the court's decision to bar the Q West from bringing in an expert witness late in the case. And I'd like to go to the start of that problem. The record seems clear that the defense knew long before the first trial even what was going to come up at trial. Everyone knew what the testimony was going to be. Dr. Salai, he had provided 213 disclosures and had been deposed. And he said what he was going to say, and he said he was going to rely upon the video. But he didn't put in his written testimony. That's exactly where I was headed, Your Honor. I believe it's at 6250 and 6247 of the common law record, where he, in fact, says that this is what they did to him. They somehow flipped him over. Dr. Salai really did give biomechanical testimony, reconstruction testimony, in a sense of saying what people did specifically. He just said, I looked at the video. I read what everybody said had happened, including the statements from the bouncers and from Logan. And somehow they ended up flipping him over. And the defense at trial has no quarrel with that. Q. West admitted that at trial that Logan went over backwards in hyperflex. That's at 3983 and 7145. I twice told the jury how he got over was no longer an issue when we got to this trial. But when they came on the scene initially and wanted to add this reconstruction expert, the judge specifically pointed out, that was in February of 24, and the judge pointed out, at least in the judge's perception from having read everything, in this case probably more often than anybody in this courtroom, to his regret, that you knew that what happened in that incident was going to be an issue. If you wanted to bring in an expert to discuss it, you should have done it then. Now you're coming in in February of 2024 when the trial is set that summer. And he said, the next trial date is not until June of 25. He said, that's too long. I'm not going to delay it that long. And that's an exercise of discretion that is surely within the trial court's control, within its authority. How would plaintiff have been prejudiced if the expert was allowed to testify? The trial court judge phrased it this way. He said it would be unfair to your client. Because we didn't have an opportunity at that point to rebut it. We hadn't brought in a reconstruction expert. We have Dr. Salaihi, a medical doctor with credentials, who said this is what caused this. This is when his neck was hyperflexed. But we didn't have somebody to do a step-by-step reconstruction to equal the stick figures that Rundell, it was his name I believe, was going to testify to. And if they had brought this expert in, I want to make sure that I don't mistake myself, at their argument, their expert was brought in supposedly to, the argument they're making in this court is this expert was brought in to show self-defense. That's why he was employed. He wasn't really there to show what happened, but rather to show what and why, to show why the bouncers did what they did. But Q West admitted, and that's why I'm looking for the page, it's 7145, that he hyperflexed and he added there that self-defense did not change that issue. In other words, self-defense, they've admitted, whether they acted in self-defense doesn't determine what happened. And that they acted in self-defense is something that surely is beyond the scope of an expert. Well, it would go to how much force was necessary from the bouncers as opposed to Mr. Blanche, his own use of his own body, right? I mean, either way it would have been relevant testimony. It was, although ironically, as I understand their argument here, from what I saw in the brief, they were not arguing to this court that they needed his reconstruction testimony to counter any evidence of force that played testifying. The only argument in the brief here is that we needed this to show self-defense. I mean, that's what I've seen before this court and that's what I responded to. And if we look at it, Dr. Slavey, he didn't measure forces. He simply said it takes some force to fracture your neck. As John has said from your personal experience, it can happen. It's very rare, but it does. It happens in skiing. It happens in wrestling. It happens, when it happens, it's, by the way, in the video of the outside, I forget the exact point, but you can see Logan's feet move. It looks like somebody pulled him further inside. Is there anything in the record to explain that? I believe, I'm sorry, I just, I couldn't pinpoint the page, but I believe there was a point where they did, there was some suggestion that they moved him before the paramedics came. I thought that was the case. I could be wrong on that, John. There was evidence in the record that when the paramedics came, they did move him.  Yeah, they put him in a chair. Exactly, exactly. Counsel, did you ever, or did plaintiff's counsel claim that the bouncers manhandled the plaintiff? Yes, that was the allegation, and that was the charge in the record. What did you mean by manhandle? Manhandle is a term that, if I recall correctly, came from the manual. Nobody objected to it. Manhandle means to handle roughly. That's the dictionary definition. That's what the manual was talking about. Okay, so your allegations is he was roughly handled. And if there had been expert testimony on behalf of defense that indicated that all they had to do was swipe their hand to deflect his feet, and under the circumstances, he would then fall back because the center of his gravity, so to speak, or his pivot point was such that he would have unfolded and broken his neck. And so now the jury is put in a position where it has to decide whether taking your hand and swinging it in an arc to deflect a kick is manhandling or not. If they decide that the arc is not picking him up and tossing him or carrying him, does the jury find in your favor or does they find in the bar's favor? I can begin my answer by saying that's not an argument that the bar will find in their brief. They did not specifically go through those details in the brief as a basis for bringing this expert into the trial. It's an interesting point, but not one that they've got that's before this court, not one that I had to respond to. And if I did have to respond to it. So are you saying that there was never an offer of proof as to what they believe the expert would opine? No, I'm sorry, no. I believe they offered his deposition. I'm not even sure of that, but his report was in the record. Was the expert allowed to read the testimony of the defense witnesses that would have indicated whether or not there was a swipe or there was a lift or a push, et cetera, or a punch, in order to base his opinion on what supposedly I think experts usually base their opinion on, which is the testimony, the discovery depositions, the evidence depositions of witnesses to the event. The expert that was barred, there's no question about what he could have or could have read. The court's ruling that an expert could not read the two vouchers depositions because the expert had been disclosed before they deposed the vouchers. That's the expert that did testify, and they agreed during the course of the trial that reading those depositions would not have changed the expert's opinion. If they did testify, they might have supported it, but they wouldn't have changed it. And we go back then to the point that when we come down to why they did what they did or how they did what they did, the vouchers testified. The jury heard how they did it, and they heard what happened. Did the judge indicate why he thought that the witness's testimony was superfluous or immaterial? I believe in part because the two witnesses, the vouchers at trial, had already testified to what happened, and Dr. Saleli had described what happened, and there was no dispute at this trial about how this happened. In fact, they'd agreed. He was flipped over somehow. Either by himself putting himself in that position up on his shoulders and his legs in the air, or they flipped him over. But that leads me to one final point, though. Even assuming the ruling was improper, the two-issue rule cancels any error. This case went to the jury on six charges. When we're talking about the biomechanics, we're only talking about the last charge, the manhandling charge, not the five others, and that's why it's simply irrelevant. How he was flipped or why he went over has nothing to do with whether they should have ejected him immediately, whether they should have ejected him after the second incident, whether they were improperly trained. Well, you bring up the point about the two-issue rule, but the manual comes into play because at trial and in your own brief, page 36 of your brief, you refer to the employee manual arguing that delaying ejection is the biggest mistake a door host can make. Exactly. After what we said in the disposition of paragraph 15, 16. I recall the paragraph, yeah. Very specific. What we said about the manual and use of a manual. Why did you need the manual? Because the manual supported Bruce Carroll's testimony. And because unless this court's going to ignore Hudson and Darling and all the cases we've cited, the manual describes what should happen when bouncers have a problem in a bar. And this is not uncommon. If there was a question about what my plumber should have done that caused the house to flood. Professional opinion versus a bartender opinion. A doctor versus a bartender. Bringing in standards and policies apply in any instance where the jury might not understand what rules apply. If you're in a sailing boat accident, a boating accident, you have statutes that set the standard. So you bring in people to say, well, this is what is expected of you under those circumstances. And if you don't do that, then the jury decides if you did or didn't do that, that violated your duty. But that's a two-step process. If the plumber floods my house, we bring in evidence about what plumbers usually do. Because otherwise you're asking the jury to make, going back to what this court said, you're asking jurors to make a decision without any input. They don't know what plumbers do. They don't know what sailors do. That's why you call experts on security. Exactly. And those experts are not just using a vernacular, blowing smoke. An expert who just stands up there or sits up there and says, this is what they should have done. They should have stopped before that stop sign. They should have done this. And doesn't say anything else. There's no foundation for that opinion. That's just me testifying as an expert and as a lawyer. Someone's got to say why I hold that opinion. And in this case, they hold the opinion because they were familiar with the standard of care, because of his background as a security expert for lettuce entertainer, and because they looked at this manual and all the manuals. I mean, the witnesses in this case pretty much conceded that what's in that manual is standard. That's just the standard of care. If they had not used the word manual, all that evidence would still have come in. That's about the best I can do to answer that, Your Honor. And for that reason, we rely upon Hudson in the mind of cases that say that evidence of the standard is admissible. Evidence of policy is admissible to show what the standard is, to see whether or not the people acted properly or didn't act properly. It determines whether or not they violated their duty. But that's a separate process. Counsel, you stated, I believe, that the reason why the expert wasn't supposed to have read the bouncers' testimony was because they had already given it. Is that – did I hear you correctly? The reason that the experts – that Mr. Collins was not allowed to read the bouncers' depositions is because his opinion had already been disclosed, and people had moved ahead, coming first, and still can't close the trial. People had already relied upon it, and the court was not going to let him go back in an entirety sense. To quote the trial court, it was just too late to go back and let him redo his opinion by finding another grounds for it. That's a discretionary call, and I think the record shows the court felt very strongly about it. And interestingly enough – So are we talking about testimony at trial or depositional testimony? We're talking about using the depositional testimony, reading the depositional testimony, to inform his opinion at trial. And it might have come up earlier in the argument, but the defense counsel at trial agreed that that would not have changed that expert's opinion. It's at page 2956. The defense agreed that reading the depositions of the two bouncers would not have changed Collins' opinion. If they wouldn't have changed his opinion and simply acted as some further support for his opinion, I believe it's within the discretion of the trial court to decide whether or not that's sufficient. And what was his opinion? That they were operating properly or not? I'm not sure what that expert would have done with those depositions, because I don't believe he said what. Nobody said what he would have done. No one said that allowing Collins to read those two depositions would have changed his opinion. I'm not concerned with changing it. I'm concerned with what the jury would be allowed to consider for purposes of giving weight to his opinion. The idea is that the jury is supposed to assess and weigh an opinion based upon what the expert reviewed. Exactly. And so if you say that the expert looked at the cover of the file, then the jury might determine that his expertise isn't very worthwhile. If the expert testifies that I read all the testimonies, I read all the depositions, I read all the pleadings, and this is my opinion, then whether or not he gave a new opinion, a different opinion, or the same opinion really doesn't make any difference in my opinion. It goes to the weight that's supposed to be given to the testimony. And if you don't allow him to say that I watched the Zubruder film and I saw Kennedy shot, then obviously people wouldn't believe him when he said, I saw what happened. So when you say it wouldn't have changed his opinion, to me that's a non sequitur. I'll try to remove the non sequitur. And then suggest whether it would enhance the defense or whether it wouldn't enhance, whether it would impeach the defense. I can't say Your Honor's wrong because I argued earlier that you use information so that the expert's opinion is not just a personal opinion. And that's why we use the manual. But going to this instance, this wasn't a Zubruder film. That was the trial court's point. This was an instance where you didn't have two bouncers in a silo. You already knew what they were going to say. They called the police. They gave statements. When their expert was able to look at everything, he had everything except what they actually said. And so he could have pointed that out to the jury. He did point that out to the jury. I relied upon all these things. Those other things, the video, all the depositions, all the reports, all the 213s, had what the two bouncers claimed. So he knew that. He didn't need this to say anything else. One simple fact that he had formed the opinion without seeing those two could have been subject to cross-examination anyway. So if he says, I did review them, the cross would be you came up with your opinion before you even reviewed them. I think this is going back to what I tried to say earlier. Sir, those two depositions didn't change your opinion, did they? You don't have to say no, they didn't. That would be it. I'm sorry. My time is up. So I'll let the court answer your questions. Thank you, counsel. Thank you. All right, Mr. Maxey, when you're ready. Thank you, Your Honor. Briefly, the counsel stated that Mr. Rundell, Dr. Rundell, was only going to testify to a tent. That's not true. On page 29, and he didn't say anything other than that in the brief, but on page 29 of our brief, we state plaintiff's claim that he, a 240-pound man, was picked up and thrown over backwards is not consistent with the video biomechanics. Dr. Rundell, his reconstruction of how the heel kicks led to the pressure placed on plaintiff's neck and his injury. Furthermore, Dr. Rundell opined if Mr. Blaine had not been kicking, there would have been no need for a defensive reaction, which led to his rolling backwards and ultimately to his bilateral facet dislocation and other related injuries. Very clearly, we were going to rely upon his reconstruction testimony about what happened and the pressure that was placed, and that was going to be part of his testimony, and his report is in the record. So, again, you're going to the reasonableness of the force in response to the kicking. Yes, yes, the reasonableness of what happened in the vestibule based upon the kinematics of the individuals, their witness testimony, the video testimony, and then his expertise, he's going to reconstruct what happened in the vestibule. So it's a level of force. You're saying it's not causation. It's a level of force, and yes, and that being, and that the level of force was not picked up and thrown over, but that he did suffer that sort of injury that Drs. Lally said, but it wasn't because they were picking him up and throwing him over. They were actively defending themselves, and over his reconstruction testimony, he's going to show the plaintiff was up on his back kicking them, high kicks toward them, and then in less than a second or a second, they pushed his legs, and that force and the way he was positioned in the vestibule was why he flipped over. As somebody testified, it was a freak accident. It was not, their intent was not to use excessive force. Right. It's not excessive force. And also that when he kicked them, the equal and opposite vector forces moved him into a position where he broke his own neck. I.e., if they had been standing there with their arms in their, at their sides and their hands in their pockets, and he had kicked off of them and had broken his neck, could that have happened, or is that not possible? I mean, according to just my understanding of Rendell, it could have happened because of his position. He could have kicked up, and then they pushed him back, or they, well, I said, he fell backwards because of equal and opposite forces.  In other words, when you kick someone, usually you go in the opposite direction. Most vectors or centrifugal or centripetal force, equal and opposite reactions. Okay. So the point is, if they're standing there and he kicks them, and he falls backwards without their motion, you're not even talking self-defense, are you? Correct. Right, in that situation. And the question I then asked you, which I'm not sure you answered was, was the situation such that if they had done nothing, he would have ended up breaking his neck anyway because he was in the process of pushing against them, he pushed himself over and broke his neck? Correct. Correct. No, not correct, correct. Yes. What's the probability the expert might have said that? Yes, the expert very well could have said that. Thank you. And then also the two-issue rule, I think the fact that the manual obviates a two-issue rule. It was so prejudicial throughout the trial that that two-issue rule would not even apply, aside from the fact that we have the argument as well in our brief that those issues all revolve around the self-defense that happened in the vestibule. Everything led there, and if there was any damage at any part of the cause, everything was the cause of what happened in the vestibule. It was only a matter of minutes between the first activity and the removal of Bland from the restaurant. They didn't, the bartender, or the chief's assistant manager, gave him a break and put him in the office for six minutes, right? Correct, correct. And then things went haywire after that. Correct. Really, yes, it does, there's really a lack of even a proximate cause there, but even if you would say there was, it would lead ultimately to the vestibule, to where these guys are trying to self-defend themselves, and we were barred for... Even if the patient is behaving badly, QBAR still owes a responsibility or a duty to not injure him, correct? Correct, correct. That was not their intent. It was never their intent. They were just trying to remove him from the bar. He was a very strong, aggressive young man. He was six foot tall, 240 pounds, and he was very, very intoxicated. QBAR had five employees on them, right? Well, yes, they did have a guy on each arm, a guy behind him, and a guy in front clearing the way. So yes, they did, but he was a very big, strong man. He didn't initiate any contact with the bouncers before the bouncers put hands on him, did he? I don't believe that they did that, that he reached contact with them. It's just that he was in other scuffles with a couple other people in the bar. He exploded in the vestibule when he grabbed to hang on. Correct. He was trying to resist, strongly resist, going out of the bar. I'm not going, I'm not going, and then he held on, and then that's why they had to pull him out, and then everybody fell to the ground. And then he was kicking them then, and then they were like, hey, hey, stop. They were like, okay, okay, I'm done. And then as they got up, he starts kicking them again, and that's what triggered that defensive reaction to self-defense. So as to the manual, are you asking us to rule that the manual is not admissible in any way? We would ask that, yes, we would. It's not. It doesn't, they, it's not, in these cases, when the manual is brought up, it's if the manual is consistent with the law. So if the law tells you you're not to discriminate against somebody, and then you're discriminating against somebody in your place of employment, that's consistent with the law. Here, you have to cut somebody off, and you can't have somebody, I don't know whether, there's no law behind that. That's a manual, somebody that's put in the manual. It's not, there is no duty in the law of that. And so by putting that forth and saying this is your duty, and this is what you have to do, this is what you're required to do, you're basically putting, you're elevating the manual to a duty that's not there in the law, and that's the distinction here. And that's why we do believe it should be excluded.  Just one more question. I find that the video shows the bouncers pantomiming the flipping. Where in the videos is that? They say it happened at the end, after everything happened, the police came, and there's some, I believe it's Mr. Finlayson, Whitmer, and maybe O'Hara, and that, it's unclear. Whitmer testified no, that's not what we were doing. I saw in one, I think it's Whitmer, puts his hand behind his neck and moves his head a little bit. Yeah, it was Finlayson. It was Mr. Finlayson, I guess, did that. And I don't know if that's what he was talking about. Trying to clarify what happened? Right, maybe he was trying to do that on time. It doesn't show that they pantomimed. Right, right, right. That's all I have. All right, thank you very much. Thank you, counsel. I want to thank both of the attorneys for their arguments. We will consider the matter and issue a ruling in due course and recess until our next argument.